<u>Stock Redemption Agreement</u>

Agreement made this 14th day of August, 2008, by and among Whitehouse Estates Inc., a New York corporation (hereinafter referred to as "Whitehouse" or the "Corporation"), which is the lessee under a ground lease for an income-producing real property located at 350 East 52nd Street, New York, NY (the "Building"); Roberta L. Koeppel and Alexandra Koeppel, as Executors of the estate of Robert A. Koeppel (the "E/O RAK") and Trustees of the trust created under Article FOURTH of the last will of Robert A. Koeppel (the "Art. 4th Trust"), all c/o Koeppel Management Company LLC, 141 East 89th Street, New York, NY, and William W. Koeppel of 150 Bradley Place, Palm Beach, Florida (hereinafter referred to as "William"). This Stock Redemption Agreement and the Exhibits hereto are collectively referred to as the "Agreement."

WITNESSETH:

WHEREAS, simultaneously with this Agreement the parties hereto and others are entering into a settlement agreement (the "Settlement Agreement") pursuant to which the parties hereto and the other parties thereto are settling actions and proceedings identified more particularly on Schedule B to the Settlement Agreement and all other claims which any party to the Settlement Agreement has or may have against any other party or parties thereto; and

WHEREAS, William has agreed: (1) to enter into the Settlement Agreement and be bound by its terms; (2) to consent *inter alia* to the settlement of the actions and proceedings listed on Schedule B to the Settlement Agreement on the terms and conditions stated therein; and (3) to dismiss and withdraw his objections to, approve and accept and agree to be bound by accountings for the E/O RAK and the Art. 4th Trust, and of Robert A. Koeppel the deceased trustee, and Alexandra Koeppel, as successor trustee of the Ruth Koeppel 1993 Revocable

Grantor Trust (hereinafter "the '93 Trust"), (collectively the "Accountings") as provided in the Settlement Agreement; and

WHEREAS, the Executors of the E/O RAK and Trustees of the Art. 4th Trust have agreed to the sale and redemption of the shares of Whitehouse, held in the Art. 4th Trust, and to cause Whitehouse to purchase and redeem said shares, upon the terms and conditions set forth herein.

NOW, THEREFORE, on the terms and subject to the conditions set forth herein, the parties agree, as follows:

1. Except as otherwise indicated herein the capitalized terms used herein will have the same meanings as provided in the Settlement Agreement and the schedules thereto.

2. Whitehouse and the Executors of the E/O RAK and the Trustees of the Art. 4th Trust represent, as follows:

(a) Whitehouse is a corporation duly organized, validly existing and in good standing under the laws of the State of New York, has full requisite corporate power and authority to carry on its business as it is currently being conducted and to own and operate the properties currently owned and operated by it.

(b) The authorized capital stock of the Corporation consists of 200 shares of Stock, without par value, of which 22.66 shares are duly and validly issued and outstanding and fully paid and non-assessable.

(c) Since May 31, 2007, Whitehouse has conducted its business in the usual and ordinary course, consistent with past practices, and, except for the Settlement Agreement and this Agreement and the transactions contemplated thereby, Whitehouse has not entered into any

material transaction, contract or commitment, other than normal contracts and commitments in the usual and ordinary course of its business.

(d) Except for claims by or litigation with William, Nancy, Ruth's estate and the trusts by or for Ruth's benefit, there are no claims or litigation pending or threatened against Whitehouse.

3. William represents, as follows:

(a) The Pledge Agreement (as hereinafter defined) and this Agreement are, or when executed will be, valid and binding obligations of William enforceable against him in accordance with their terms except as enforcement thereof may be limited under the Federal Bankruptcy or similar laws.

(b) William has been afforded free access to the Building and been furnished with all the information concerning Whitehouse and the Building and their operations which he has requested. He has not and is not relying on any representation concerning the Building, the ground lease affecting the Building, and the operations of Whitehouse or the Building not set forth in this Agreement.

(c) At the Closing, the Whitehouse Promissory Note (as that term is hereinafter defined) issued by Whitehouse will be authorized by all necessary corporate action and will, when issued, be a valid and binding obligation of Whitehouse enforceable in accordance with its terms except as enforcement may be limited under the Federal Bankruptcy or other similar laws.

4. Subject to the Closing, William consents and agrees to be a party to and bound by the Settlement Agreement on the terms and conditions set forth therein and to approve and accept the Accountings and to provide such unconditional appearances, waivers and consents as

may be necessary for the judicial settlement of the Accountings by the Surrogate's Court, New York County.

5. The Trustees of the Art. 4th Trust, as shareholders and directors, agree to vote all of the outstanding shares of Whitehouse which are owned by the Art. 4th Trust in favor of the redemption of such shares and for a resolution authorizing Whitehouse to purchase and redeem such shares on the terms and conditions provided in this Agreement.

6. William agrees to vote all of the outstanding shares of Whitehouse which he owns in favor of the redemption of the shares of Whitehouse owned by the Art. 4th Trust on the terms and conditions provided in this Agreement.

7. The Closing of the transactions provided for in this Agreement will be held simultaneously with and at the same location as the Closing under the Settlement Agreement. At the Closing, subject to the completion of the transactions provided for in the Settlement Agreement in accordance with its terms, including, without limitation, that the transactions provided for in the Settlement Agreement are subject to completion of the transactions provided for in this Agreement, the Art. 4th Trust will sell to Whitehouse and Whitehouse will purchase and redeem from the Art. 4th Trust and pay for 10.34 shares of its outstanding stock, being all of the outstanding shares of Whitehouse owned by the Art. 4th Trust (and, at the time of such purchase, being all of the outstanding shares of Whitehouse not owned by William) for a purchase price of $15,000,000, payable by Whitehouse's issuance of a promissory note (hereinafter the "Whitehouse Promissory Note") in that principal amount to the Art. 4th Trust. The form of the Whitehouse Promissory Note to be used is attached hereto as Schedule A.

8. The Whitehouse Promissory Note to be issued to the Art. 4th Trust, in the form annexed hereto as Exhibit A, shall:

(a) be payable as to principal on the first to occur of the following:

(i) thirty-five years from the date of issuance of the Whitehouse Promissory Note;

(ii) the sale or transfer of the Building or all or any part of Whitehouse's interest in the Building or a controlling interest in Whitehouse;

(iii) a date which is eight months after the death of Roberta L. Koeppel; or

(iv) a date which is one year after the death of William W. Koeppel;

(b) bear interest at the rate of five (5%) percent per annum, payable monthly as to interest only, by electronic transfer or check drawn on a New York bank, on the fifteenth day of each and every month until paid in full as to both principal and interest;

(c) provide that if a payment is not made when due and is nevertheless accepted by the Whitehouse Promissory Note holder, Whitehouse will pay the holder a late payment fee equal to 2% of the amount of the payment;

(d) provide that if a payment is not properly or timely credited because of errors on the part of the Whitehouse Promissory Note holder or the note holder's bank, the Whitehouse Promissory Note holder will not be entitled to the late payment fee. Moreover, mistakes or errors on the part of the Whitehouse Promissory Note holder or the note holder's bank shall not constitute a default on the part of Whitehouse hereunder.

9. The happening of any one of the following will constitute without further notice or demand, except as herein provided, an Event of Default under the terms of the Whitehouse Promissory Note.

(a) The failure to pay interest or principal as provided in the Whitehouse Promissory Note within ten (10) days of the date on which due and payable.

(b) The failure to pay, when due, the following obligations which Whitehouse or William are required to pay under the Settlement Agreement:

(i) Interest or principal on the promissory notes issued by Whitehouse pursuant to the Settlement Agreement, except for the notes held by William;

(ii) William's one-sixth share of the 93 Trust's liabilities, including penalties and interest, if any, thereon and the reasonable and necessary costs of defending against the same, as provided for in Section 9.2 of the Settlement Agreement, which relate to estate taxes owed for Ruth's estate and income taxes incurred on the redemption or sale, pursuant to the Settlement Agreement, of the Business Interests held by the 93 Trust.

(c) The issuance or transfer of any shares or securities of any kind by Whitehouse without the prior written consent of the Whitehouse Promissory Note holder.

(d) The sale, transfer or termination without the prior written consent of the Whitehouse Promissory Note holder of all or any part of Whitehouse's interest, as lessee, under the ground lease for the Building.

(e) The merger, consolidation or corporate reorganization of Whitehouse or the sale or transfer of any substantial part of Whitehouse's assets without prior written consent of the Whitehouse Promissory Note holder. The Parties hereto understand that William intends to make an election for Whitehouse to be treated as a Subchapter "S" corporation, and the Parties expressly agree that any such election will not violate the terms of the foregoing sentence or otherwise constitute an Event of Default under any provision of this Agreement.

(f) Any substantial damage to the Building which renders the Building or any substantial part thereof uninhabitable or any of its plumbing, electrical, HVAC or elevator systems inoperable unless any of the foregoing are covered by insurance adequate in amount to replace or restore the damaged area or systems and repair thereof has commenced promptly and been diligently pursued to completion. In determining whether the replacement, repair or restoration has commenced promptly and been diligently pursued, the availability of labor and materials during the time the work is to be commenced and pursued will be taken into account.

(g) The failure to keep the Building and its furniture, fixtures, systems and equipment insured against loss or damage with an insurance company licensed to do business in the State of New York and acceptable to and approved by the mortgagee currently holding a mortgage on the Building (or any successor institutional mortgagee). Should there be no institutional mortgagee holding a mortgage on the Building, the insurance must be placed with an insurance company licensed to do business in the State of New York that has Best's Financial Strength Rating of B+ or better and Best's Issuer Credit Rating of bbb or better. If an insurer's rating drops below the specified levels during the period of the policy issued to Whitehouse, it shall not constitute an Event of Default hereunder if, within 120 days of such drop, William and/or Whitehouse procure insurance with another insurer whose ratings are satisfactory under the terms of this Agreement.

(h) Whitehouse's inability to pay its debts as they become due, or any act of insolvency or resort to any law or statute for protection from the claims of creditors under any state or federal law including filing a petition in bankruptcy, making an assignment for the benefit of creditors or being subject to a petition in bankruptcy, provided, however, that, in the



RSP000195

case of an involuntary bankruptcy proceeding, it shall not be an Event of Default if such petition or proceeding is stayed, dismissed or discharged within 90 days from the date of filing.

(i) With respect to Whitehouse or William, an assignment of assets for the benefit of creditors or any voluntary proceeding for dissolution or liquidation or seeking the protection of the bankruptcy court.

(j) Any breach of the mortgage now or any mortgage hereafter affecting the Building which has been the subject of or identified in a notice from the mortgagee, or an acceleration of the debt secured by the mortgage which breach or acceleration has not been cured within any applicable grace period, if a grace period is afforded by the mortgage.

(k) Any attempt to place a mortgage on the Building, other than one in a transaction in which all principal and accrued interest owed to the Whitehouse Promissory Note Holder will be paid in full, or any amendment or modification of the existing mortgage without the prior written consent of the holder of the Whitehouse Promissory Note which approval will not be unreasonably withheld if the new mortgage or amendment or modification of the existing mortgage does not increase the amount of the debt which it secures, other than increases in the principal of the mortgage which are fully used to make principal payments to the Noteholders (other than William) under the notes issued by Whitehouse pursuant to the Settlement Agreement.

(l) Any breach of or event of default under the ground lease presently in effect or any renewal or extension thereof, which has been the subject of or identified in a notice from the ground lessor and which has not been cured within any applicable grace period, if a grace period is afforded by the ground lease.

(m) Allowing or permitting the Building or any part thereof to become or be subject to a material or mechanic's lien which is not discharged within sixty (60) days, or any violation (other than the current violations, copies of which are attached hereto) which is not substantially cured within 60 days and removed within a reasonable time thereafter. The fact that the Department of Buildings or other agency which issued the violation has not removed it from the records of the Building shall not be deemed a failure to cure the violation, if the violation has been substantially cured within 60 days and the removal of it as a matter of record is diligently pursued and the delay in removing the violation is attributable to the agency which issued it.

(n) The failure to provide the certification as to the absence of an Event of Default and the financial statements in accordance with §13 hereof within ten (10) days after either has been demanded in writing, provided, however, the financial statements need only be furnished once for each fiscal year within 120 days after the conclusion of such fiscal year.

(o) Changing the essential nature of the business of Whitehouse, that is, the leasing of spaces in the Building to residential or commercial tenants and related activities, provided, however, that the Parties agree that the acquisition by Whitehouse from the ground lessor of its fee interest in the real estate improved by the Building is expressly permitted and not a violation of this provision nor an Event of Default provided that no condition or term of the transaction by which the fee is so acquired is one which would constitute an Event of Default hereunder.

(p) The failure to file complete and accurate tax returns or to pay assessments, sewer rents, water charges and taxes of any kind when the same are due, provided, however, that Whitehouse may obtain timely and lawful extensions of time in which to file its tax returns in

accordance with applicable law including the payment of any taxes estimated in good faith to be due with the extension request.

(q) Any breach of the Pledge Agreement by William or Whitehouse.

10. Whitehouse agrees and William agrees to cause Whitehouse:

(a) To keep the Building insured against fire, windstorm and other casualties in an amount or amounts at least equal to those which it presently has in effect. Such insurance shall be placed with either (a) any insurance company or companies used by or satisfactory to the Art. 4th Trustees, or (b) an insurance company or companies licensed to do business in the State of New York that has Best's Financial Strength Rating of "B+" or better and Best's Issuer Credit Rating of "bbb" or better. Whitehouse will and William will cause Whitehouse to provide to the Art. 4th Trust copies of the insurance policies or a certificate of the insurer that they are in effect. So long as there is no additional expense to Whitehouse (unless the Whitehouse Noteholder pays such increased expense) Whitehouse will use its best efforts to (i) include the Art. 4th Trust as a named insured under any policy it obtains or continues as its interest may appear, and (ii) require the company or companies insuring the Building to give at least thirty (30) days prior notice to the Art. 4th Trust of any cancellation or intended cancellation of the coverage of the Building.

(b) To keep the Building and all its electrical and mechanical systems, in good repair and to promptly comply with any notice from an insurance company insuring the Building or Whitehouse relating to the condition of the Building or otherwise.

11. In order to secure the payment by Whitehouse of principal and interest on the Whitehouse Promissory Note when the same become due William grants a security interest in and will pledge and hypothecate all of the outstanding shares of Whitehouse to the Art. 4th Trust in accordance with the form of Pledge Agreement annexed as Schedule B hereto; and

Whitehouse grants to the Art. 4th Trust a security interest in all of its leases, receivables, contract rights, and all other agreements affecting the use or occupancy of the Building now or hereafter entered into and the right to receive rents and profits and apply them of the principal and interest on the Whitehouse Promissory Note (which security interest is inferior and subordinate to the rights of mortgagees under a mortgage to which the building owned by Whitehouse is presently subject and any permissible modification or extension thereof) and in connection therewith the Art. 4th Trust may sign and file financing statements in the form or forms as may be necessary to perfect the security interest herein granted.

12. The Art. 4th Trust will indemnify Whitehouse and hold it harmless against (1) any taxes due and payable prior to the Closing which have not been paid and interest and penalties thereon, (2) any rent which must be refunded to a tenant because of an overcharge prior to Closing, (3) any amounts required to be paid on account of wage claims based on underpayments prior to Closing. The Art. 4th Trust will cause to be filed and diligently pursue a tax certiorari proceeding for the fiscal year ended May 31, 2007, and any prior years, within the filing period.

13. Within 120 days after the end of the fiscal year of Whitehouse in which the Closing occurs and each of Whitehouse's fiscal years thereafter during which any of the principal or income under the Whitehouse Promissory Note remains unpaid: (1) Whitehouse will and William will cause it to prepare and deliver to the holder of the Whitehouse Promissory Note a balance sheet, income statement and statement of changes in financial position at and as of the end of the preceding fiscal year and for the year then ended in accordance with Statements of Standards for Accounting and Review Services issued by the American Institute of Certified Accountants. Such financial statements shall have been prepared by a reputable certified public accountant satisfactory to the Art. 4th Trust (Noah Rifkin is a reputable certified public

accountant satisfactory to the Art. 4th Trust); and (2) William will certify in writing to the holder of the Whitehouse Promissory Note that no event has occurred which would or with the giving of notice or passage of time would constitute an Event of Default as described in paragraph 6 above.

14. In the event that the Building or Whitehouse's interest in the ground lease or a controlling interest in Whitehouse is sold or transferred (each being referred to below as a Transfer) the full remaining principal of and all interest accrued on the Note shall become immediately due and payable. In addition, if (i) an agreement or understanding with respect to the consideration to be paid for the Transfer is reached within sixty (60) months of the Closing; and (ii) the consideration for such Transfer is in excess of $38,500,000 plus the sum of (1) 150% of the cost, if any, which may have been incurred by Whitehouse or William to acquire from the ground lessor its fee interest in the real estate improved by the Building and (2) the amount, estimated in good faith, of New York State and City real estate transfer taxes, if any, payable on the transfer (the "Cost Basis"), then, upon the Closing of such Transfer, William or Whitehouse will pay to the Art. 4th Trust fifty-nine percent (59%) of the amount received, net of usual and customary closing costs actually paid, including, without limitation, brokerage commissions, recording and transfer fees and expenses, in excess of the Cost Basis for the Building and real estate or the controlling interest, limited as follows:

(a) If an agreement or understanding with respect to the consideration to be paid for the Transfer is reached within eighteen (18) months of the Closing and the Transfer occurs thereafter, the maximum payable to the Art. 4th Trust shall be $5,900,000.

(b) If an agreement or understanding with respect to the consideration to be paid for the Transfer is reached more than eighteen (18) months but less than thirty-six (36)

months after the Closing and the Transfer occurs thereafter, the maximum payable to the Art. 4th Trust shall be $4,425,000.

(c) If an agreement or understanding with respect to the consideration to be paid for the Transfer is reached more than thirty-six (36) months but less than sixty (60) months after the Closing and the Transfer occurs thereafter the Art. 4th Trust the maximum payable to the Art. 4th Trust shall be $2,950,000.

(d) If an agreement or understanding with respect to the consideration to be paid for the Transfer is not reached within sixty (60) months after the Closing, the Art. 4th Trust will only be entitled to payment of the full principal amount and all interest accrued on the Whitehouse Promissory Note.

In the event that the Art. 4th Trust receives a payment hereunder in excess of the principal and interest due under the Whitehouse Promissory Note, the Art. 4th Trust shall be responsible for any income or capital gains taxes thereon.

15. It will be a condition of the Closing that prior thereto Whitehouse has obtained from Capitol One N. A. successor by merger to North Fork Bank, its consent pursuant to section 9 of the mortgage in its favor presently affecting the Building (i) to the pledge and encumbrance of William's shares of Whitehouse to secure the Whitehouse Promissory Note and (ii) to the grant of a security interest in the building as provided in paragraph 11 above which is junior and subordinate to the rights of the mortgagor.

16. At the Closing:

(a) Roberta and Alexandra as Officers and Directors of Whitehouse and Edward Minton as an officer will resign in writing as directors and officers of Whitehouse. At the request of William prior to their resignation they will elect William a director and adopt

banking resolutions authorizing him as a signatory on Whitehouse bank accounts, including without limitation, all accounts in which commercial and residential Tenants' security deposits are held which shall be placed by the E/O RAK or the Art. 4th Trust in accounts in the name of Whitehouse if they are not presently held in the name of Whitehouse.

(b) Roberta and Alexandra will cause Whitehouse to deliver its corporate books and records and the originals of leases for apartment and commercial space in the Building and such records with respect to its operations as William may request in writing prior to the Closing. From time to time after the Closing, the Estate RAK and the Art. 4th Trust, on 72 hours written notice, will be granted full access to and the right to copy any of the records of Whitehouse delivered to William pursuant hereto. Any such copies must be made at the expense (paid in advance on the basis of a reasonable estimate) of the Art. 4th Trust at a vendor reasonably agreeable to William and the Art. 4th Trust and at no time shall Roberta or Alexandra or anyone acting on their behalf have access to such records while they are out for copying.

(c) The Art. 4th Trust will deliver to Whitehouse a certificate for the shares being purchased and redeemed by Whitehouse duly endorsed or accompanied by appropriate stock power properly executed for the transfer of the Shares to Whitehouse.

17. At the Closing William will deliver or cause Whitehouse to deliver:

(a) The Whitehouse Promissory Note;

(b) The Pledge Agreement in the form annexed as Schedule B;

(c) The Shares of Whitehouse in accordance with the Pledge Agreement,

(d) In the event any transfer taxes are incurred that are payable to the New York State Department of Taxation and Finance and or the NYC Commissioner of Finance for New York State and New York City real estate transfer taxes on account of the transactions in

this Agreement, William (through Whitehouse) and the Art. 4th Trust will each pay one half of any such taxes.

18. No party to this Agreement or an affiliated person or a spouse of a party to this Agreement, or an affiliate of any of the foregoing, other than William, will, directly or indirectly, offer to acquire, acquire, attempt to acquire, or aid, abet or participate in any offer to acquire any interest in the land upon which the Building is located. For the purposes of this section, an affiliate shall include, without limitation, an affiliated corporation or unincorporated business.

19. In the event that an action or proceeding is brought or instituted by a party to this Agreement or the Whitehouse Promissory Note holder to enforce the provisions hereof or of the Pledge Agreement or the Whitehouse Promissory Note against Whitehouse or another party to this Agreement, the substantially prevailing party as reflected in the decision of the finder of fact or law shall be entitled to recover reasonable attorneys fees and other reasonable out-of-pocket expenses of the litigation from the other party or parties to such action or proceeding. In the event that the E/O RAK or the Art 4th Trust recovers such fees or expenses, they shall be credited to the account, that is, principal or income, from which the recovered amounts were paid.

20. Upon payment in full of all principal and interest due on the Whitehouse Promissory Note, the provisions of paragraphs "8," "9," "10," "11," "13" and the first sentence of "14" shall no longer have any force or effect, and the Noteholder shall return:

(a) The Whitehouse Promissory Note, marked as "paid in full;"

(b) The Pledge Agreement, marked "cancelled;"

(c) All security, including, without limitation, the Whitehouse stock certificate in William's name.

21. William is to be apprised of any proposed sale of a property owned by a business entity owned by E/O RAK or Art. 4th Trust and the name(s), address(es), phone numbers and known e-mail addresses of: (1) the intended purchaser(s); and (2) any and all person(s), firm(s) or entity(ies) then acting on behalf of the intended purchaser(s) in the negotiations or anticipated transactions, including, without limitation, all brokers and agents, at least 15 days prior to the execution of a contract of sale and at least 45 days prior to the closing. Nothing in the preceding sentence shall obligate the Estate of RAK, the RAK Trust or any of their representatives to obtain information that is not known to them, and the failure to obtain any such unknown information shall not give William a right to object to or invalidate any such sale.

22. Entire Agreement.

(a) Except for the Settlement Agreement this Agreement contains the entire agreement among the parties hereto with respect to the purchase of the Shares and supersedes all prior arrangements or understandings with respect thereto.

(b) This Agreement may be amended only by a written instrument duly executed and delivered by all of the parties hereto.

(c) For the convenience of the parties, any number of counterparts of this Agreement may be executed by one or more parties hereto and each such executed counterpart shall be, and shall be deemed to be, an original instrument but taken together they shall constitute a single agreement.

(d) All notices, demands, consents, requests, instructions, approvals and other communications provided for herein must be in writing and shall be deemed validly given, made or served, if (a) delivered personally, (b) delivered by prepaid overnight courier, or (c) sent by certified mail, postage prepaid, and shall be deemed delivered five (5) business days after

mailing, or if given by overnight courier or personal delivery, on the date accepted or refused at the addresses to which sent if addressed as follows (or to such other addresses as any party hereto may from time to time designate in a writing delivered in a like manner).

If to William W. Koeppel: 150 Bradley Place
Palm Beach, Florida 33480

With a copy sent by the same method and by e-mail to:

Craig Avedisian, Esq.
Law offices of Craig Avedisian, P.C.
60 East 42nd Street, 40th Floor
New York, NY 10165
craig@avedisian.net

If to Roberta L. Koeppel and Alexandra Koeppel:
c/o Koeppel Management Company, LLC
141 East 89th Street
New York, NY 10128

With a copy sent by the same method and by e-mail to:

Edward J. Walsh, Jr., Esq.
Vedder Price P.C.
1633 Broadway – 47th Floor
New York, NY 10019
ewalsh@vedderprice.com

(e) This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the successors and assigns of the parties hereto.

(f) Any provision of this Agreement which prohibited or non-enforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the existing provisions hereof, and any such prohibition or

unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

(g) This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York as applied to contracts made and to be fully performed in New York. Each of the parties hereto shall take all such lawful action as may be necessary or appropriate in order to effectuate the transaction contemplated hereby. In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement each shall take all such lawful and necessary action.

IN WITNESS WHEREOF, the parties hereto have deemed this Agreement to be duly executed all as of the day and year first above written.

WHITEHOUSE ESTATES INC.

By: [signature]
Roberta L. Koeppel, President

[signature]
William W. Koeppel

Estate of Robert A. Koeppel and Trust under Article FOURTH of Will

By [signature]
Roberta A. Koeppel, Executor and Trustee

By [signature]
Alexandra Koeppel, Executor and Trustee

State of New York )
) ss.:
County of New York )

On the 14th day of August in the year 2008 before me, the undersigned, personally appeared ROBERTA KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 20__ [Seal]

State of New York )
) ss.:
County of New York )

On the 14th day of August in the year 2008 before me, the undersigned, personally appeared ALEXANDRA KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

[Seal]

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 20__

State of New York )
) ss.:
County of New York )

On the 14th day of August in the year 2008 before me, the undersigned, personally appeared WILLIAM W. KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 20__ [Seal]

**PROMISSORY NOTE**

$15,000,000

New York, New York
August ___, 2008

FOR VALUE RECEIVED, the undersigned Whitehouse Estates, Inc. a New York corporation (herein sometimes called the "Company") promises to pay to the order of Roberta L. Koeppel and Alexandra Koeppel, Trustees of the trust created under Article FOURTH of the last will of Robert A. Koeppel (the "Art. 4th Trust"), at such place as the holder may specify from time to time on a least 10 days' written notice, the principal sum of Fifteen Million Dollars ($15,000,000) together with interest thereon at the rate of five (5%) percent per annum, which interest shall be payable monthly on the fifteenth day of each and every month from the date hereof on the amount of said principal sum remaining unpaid from time to time until the full amount of principal and all accrued interest shall have been paid.

1. Payments on this Note shall be payable at Sterling National Bank, 425 Park Avenue, New York, New York 10022. If the holder of this note specifies payment at a financial institution, it shall be one capable of receiving electronic transfers of payments. If the holder hereof designates a different place of payment, it must be in the city of New York. The holder shall give notice thereof in writing at least 10 days in advance of payment being due.

2. Unless otherwise defined herein, the words and phrases herein shall have the same meanings as in the Stock Redemption Agreement pursuant to which this Note is being given (the "Stock Redemption Agreement").

3. This Note shall be payable in full as to principal and any interest accrued thereon and then unpaid on the date of the earliest of the following to occur:

a) a date which is thirty-five years from the date of issuance of this Promissory Note that is August ____ 2043;

b) a date which is eight months after the death of Roberta L. Koeppel;

c) a date which is one year after the death of William W. Koeppel ("William");

d) the sale or transfer of a building known as and located at 350 East 52nd Street, New York, NY (the "Building") or a majority of the presently outstanding shares of the Company, the maker of this promissory Note.

4. The holder of this Note may by notice to the Company declare the entire unpaid principal amount hereof together with interest accrued thereon due and payable immediately upon or at any time after the occurrence of any of the following:

a) The Company shall fail to pay interest or principal within ten (10) days of the date on which due and payable.

b) The failure to pay, when due, the following obligations which the Company or William are required to pay under the Settlement Agreement executed simultaneously herewith by the parties hereto (the "Settlement Agreement") pursuant to which the parties hereto and the other parties thereto are settling actions and proceedings identified more particularly on Schedule B to said Settlement Agreement:

(i) Interest or principal on the promissory notes issued by the Company pursuant to the Settlement Agreement, except for the notes issued to or held by William;

(ii) William's one-sixth share of the Ruth Koeppel 1993 Revocable Grantor Trust's (the "93 Trust") liabilities, including penalties and interest, if any, thereon and the reasonable and necessary costs of defending against the same, as provided for in Section 9.2 of the Settlement Agreement, which relate to estate taxes owed by Ruth's estate and income taxes incurred on the redemption or sale, pursuant to the Settlement Agreement, of the Business Interests held by the 93 Trust.

c) The issuance or transfer of any shares or securities of any kind by the Company without the prior written consent of the holder of this Note.



RSP000209

d) The sale, transfer or termination without the prior written consent of the holder of this Note of all or any part of Company's interest, as lessee, under the ground lease for the Building.

e) The merger, consolidation or corporate reorganization of the Company, or the sale or transfer of any substantial part of its assets without the prior written consent of the holder of this Note.

f) Any substantial damage to the Building which renders the Building or any substantial part thereof uninhabitable or any of its plumbing, electrical, HVAC or elevator systems inoperable unless any of the foregoing are covered by insurance adequate in amount to replace or restore the damaged area or systems and repair thereof has commenced promptly and been diligently pursued to completion. In determining whether the replacement, repair or restoration has commenced promptly and been diligently pursued, the availability of labor and materials during the time the work is to be commenced and pursued will be taken into account.

g) The failure to keep the Building and its furniture, fixtures, systems and equipment insured against loss or damage with an insurance company licensed to do business in the State of New York and acceptable to and approved by the mortgagee currently or then holding a mortgage on the Building.

h) The Company's inability to pay its debts as they become due, or any act of insolvency or resort to any law or statute for protection from the claims of creditors under any state or federal law including filing a petition in bankruptcy, making an assignment for the benefit of creditors or being subject to a petition in bankruptcy, provided, however, that, in the case of an involuntary bankruptcy proceeding, it shall not be an Event of Default if such petition or proceeding is stayed, dismissed or discharged within 90 days from the date of filing.

i) With respect to the Company or William, an assignment of assets for the benefit of creditors or any voluntary proceeding for dissolution or liquidation or seeking the protection of the bankruptcy court.

j) Any breach of the mortgage now or any mortgage hereafter affecting the Building which has been the subject of or identified in a notice from the mortgagee, or an acceleration of the debt secured by the mortgage which breach or acceleration has not been cured within any applicable grace period, if a grace period is afforded by the mortgage.

k) Any attempt to place a mortgage on the Building, other than one in which all principal and accrued interest owed on this Note will be paid in full, or any amendment or modification of the existing mortgage without the prior written consent of the holder of this Note which approval will not be unreasonably withheld if the new mortgage or amendment or modification of the existing mortgage does not increase the amount of the debt which it secures, other than increases in the principal of the mortgage which are fully used to make principal payments to the Noteholders (other than William) under the notes issued by the Company pursuant to the Settlement Agreement.

l) Any breach of or event of default under the ground lease presently in effect or any renewal or extension thereof, which has been the subject of or identified in a notice from the ground lessor and which has not been cured within any applicable grace period, if a grace period is afforded by the ground lease.

m) Allowing or permitting the Building or any part thereof to become or be subject to a material or mechanic's lien which is not discharged within sixty (60) days, or any violation (other than the current violations, copies of which are attached hereto) which is not substantially cured within 60 days and removed within a reasonable time thereafter.

n) The failure to provide the certification as to the absence of an Event of Default and the financial statements in accordance with §13 of the Stock Redemption Agreement bearing even date herewith among the Company, Roberta L. Koeppel and Alexandra Koeppel, as Executors of the estate of Robert A. Koeppel (the "E/O RAK"), the Art. 4th Trust, and William (hereinafter, the "Redemption Agreement") within ten (10) days after either has been demanded in writing.

o) Changing the essential nature of the business of the Company, that is, the leasing of spaces in the Building to residential or commercial tenants and related activities.

p) The failure to file complete and accurate tax returns or to pay assessments, sewer rents, water charges and taxes of any kind when the same are due, provided, however, that the Company may obtain timely and lawful extensions of time in which to file its tax returns in accordance with applicable law including the payment of any taxes estimated in good faith to be due with the extension request.

q) Any breach of the Pledge Agreement by William or the Company.

5. Interest after default hereunder and until such default has been cured or this Note has been paid in full shall be payable at the rate of nine (9%) percent per annum.

6. Upon a default hereunder, the Company shall pay to the holder of this Note upon demand all legal and other costs and expenses of every kind, including reasonable attorney's fees and disbursements, incurred with respect to the collection and/or enforcement of this Note or of any rights hereunder.

7. The Company may prepay, without a penalty, all or any part of the unpaid balance of this Note from time to time together with accrued interest on the amount of principal being

prepaid. Any payments made on account of this Note shall be applied first to the payment of interest and the balance, if any, to payment of principal.

8. Miscellaneous Provisions.

a) If the Company fails to make an interest payment when due, but the holder of this Note nevertheless accepts the payment after the date is it due, the Company will pay a late payment fee equal to 2% of the amount of the payment. If a payment is not properly or timely credited because of errors on the part of the holder of this Note or the Note holder's bank, the holder of this Note will not be entitled to the late payment fee, and mistakes or errors on the part of the holder of this Note or the Note holder's bank shall not constitute a default on the part of the Company hereunder.

b) It is understood that the Company intends to make an election to be treated as a Subchapter "S" corporation, and the Parties expressly agree that any such election will not constitute an Event of Default under any provision hereto.

c) Should there be no institutional mortgagee holding a mortgage on the Building, the insurance referred to in section 4(g) hereof must be placed with an insurance company licensed to do business in the State of New York that has Best's Financial Strength Rating of B+ or better and Best's Issuer Credit Rating of bbb or better. If an insurer's rating declines below the specified levels during the period of the policy issued to the Company, it shall not constitute an Event of Default hereunder if, within 120 days of such decline, William and/or the Company replace the insurance with another insurer whose ratings are satisfactory under the terms of this Agreement.

d) The fact that the Department of Buildings or other agency which issued the violation has not removed it from the records of the Building shall not be deemed a failure to cure the violation, if the violation has been substantially cured within 60 days and the removal of it as a matter of record is diligently pursued and the delay in removing the violation of record is attributable to the agency which issued it.

e) The Parties agree that the acquisition by the Company from the ground lessor of its fee interest in the real estate improved by the Building is expressly permitted and not a violation of this provision nor an Event of Default provided that no condition or term of the transaction by which the fee is so acquired is one which would constitute an Event of Default hereunder.

f) All payments shall be made in lawful money of the United States of America and any payment by check must be made with a check drawn on a New York bank.

g) If the day on which a payment is required to be made is a Saturday, Sunday or holiday on which commercial banks are closed, then payment shall be due on the next business day.

h) This Note shall be governed by and construed and enforced in accordance with the laws of the State of New York as applied to contracts made and to be fully performed in New York.

9. Except as provided in the Stock Redemption Agreement, the Company hereby waives presentment, demand, notice of protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or endorsement of this Note, and the Company hereby agrees and consents that this Note may be extended from time to time, and that no such extension or other indulgence shall discharge or otherwise affect the liability of the Company.

IN WITNESS WHEREOF, the Company has caused this Note to be executed in its corporate name by its President thereunto duly authorized, all as of the day, month and year first above written.

WHITEHOUSE ESTATES, INC.

By: ______________________
William W. Koeppel, President

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On the ___ day of _____________, 2008 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared WILLIAM W. KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

______________________
*Notary Public*
*State of New York*

## Pledge Agreement

Agreement made this _____ day of August 2008 by and among Whitehouse Estates Inc. a New York corporation having its principal place of business at 350 East 52nd Street, New York, NY (the "Company"), Roberta L. Koeppel and Alexandra Koeppel as Trustees of a Trust under the Will of Robert A. Koeppel (the "Pledgee") and William W. Koeppel of 150 Bradley Place, Palm Beach, FL, (the "Pledgor").

### Recitals

A. The Company, the Pledgor and the Pledgee are parties to a Stock Redemption Agreement (the "Redemption Agreement") dated June ___, 2008 pursuant to which the Pledgee is selling to the Company and the Company is redeeming from Pledgee 10.34 shares of the Company's stock, without par value.

B. As a part of such transaction, the Company is delivering to the Pledgee its Promissory Note dated the date hereof in the principal amount of fifteen million dollars (the "Whitehouse Promissory Note").

C. Section 11 of the Redemption Agreement requires that the Note be secured by a pledge by Pledgor of not less than all of the issued and outstanding shares of the Company's stock.

To induce the Company to redeem its shares from the Pledgee and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. Pledge of Securities.

Pledgor grants Pledgee a security interest in and hereby pledges, transfers, sets over and delivers to the Pledgee 7.02 shares of the Company's Stock represented by Certificate Number 11 registered in the name of Pledgor (the "Shares") together with a stock power duly executed in

blank for all of such Shares and any additional Shares of the Company acquired by Pledgor in any manner and the certificates representing such additional Shares (the "Additional Shares") to secure the payment and performance of all of the obligations and liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Company to the Pledgee under the Whitehouse Promissory Note.

2. Maintenance of Pledge.

It is the intent hereof that the Shares shall at all times constitute 100% of the outstanding shares of the Company, and the Company agrees not to issue or sell any additional shares or recapitalize existing shares unless at the same time the additional shares are pledged by the Pledgor hereunder.

3. Representations; Covenants.

The Pledgor represents and warrants that he has good and marketable title to the Shares, free and clear of any mortgage, pledge, lien, encumbrance or charge of any nature whatsoever on the Shares except the pledge created by this Agreement in favor of the Pledgee, and that the Shares are duly and validly pledged hereby to the Pledgee in accordance with all applicable laws. The Pledgor covenants that he will defend the Pledgee's right, title and security interest in and to the Shares against the claims of all persons whomsoever.

4. Rights Prior to Declaration of Default.

4.1 Until an Event of Default (as hereinafter defined) shall have occurred and be continuing, the Shares shall continue to be registered in the name of the Pledgor and Pledgor shall have all rights accruing thereto including the right to vote the Shares and the right to dividends.

4.2 Only if consent in writing thereto has been given by Pledgee if the stock of the Pledgor shall be changed into or exchanged for a different number or kind of shares of stock or other securities of the Company or of another corporation, whether through merger, consolidation, reorganization, recapitalization, stock split or combination of shares, there shall be substituted for the Shares held by the Pledgee under this Agreement all of the shares of stock or other securities into which such Shares shall be so changed or for which such Shares shall be exchanged. The Pledgor hereby agrees that any securities so substituted for the Shares pursuant to the terms of such change or exchange shall be delivered directly to the Pledgee, to be held and disposed of by the Pledgee in accordance with the terms and provisions of this Agreement. The Pledgor authorizes the Pledgee to surrender the Shares or take whatever other action is required to be taken with respect to the Shares under the terms of such change or exchange and further agrees to execute and deliver to the Pledgee such stock powers as may be necessary to carry out the purposes of this Agreement in view of such substitution.

5. Default.

The following shall constitute Events of Default for the purposes of this Agreement:

(a) if the Pledgor shall be in default under the Redemption Agreement or any term thereof or under the Whitehouse Promissory Note; or

(b) if the Company or the Pledgor shall be in breach of Section 2 or Section 4.2 hereof and such breach is not remedied within ten (10) days after notice to the Company and Pledgor, with respect thereto, or

(c) if the Company shall fail to pay when due any amounts due to Pledgee pursuant to the Redemption Agreement or the Whitehouse Promissory Note.

6. Remedies on Default.

If an Event of Default shall have occurred and be continuing:

(a) The Pledgee shall have the right to vote the Shares at all meetings of stockholders of the Company and shall also have all of the rights and remedies of a secured party under the New York Uniform Commercial code, as then in effect, relating to the recovery and disposition of the Shares and such other rights and remedies as may be available to the Pledgee in law or equity.

(b) The Pledgee may exercise in respect to the pledged Shares, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the Uniform Commercial Code in effect in the State of New York at that time (the "Code") (whether or not the code applies to the pledged Shares), and may also, without notice except as specified below, sell the pledged Shares or any part thereof in one or more parcels at public or private sale, at the Pledgee's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Pledgee may deem commercially reasonable. Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to such Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Pledgee shall not be obligated to make any sale of pledged Shares regardless of notice of sale having been given. The Pledgee may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(c) Sections 9-620 and 9-623 of the Code shall apply to all parties and the pledged Shares (whether or not the Code or these sections would so apply in the absence of this sub-paragraph).

(d) All cash proceeds received by the Pledgee in respect of any sale of, collection from, or other realization upon all or any part of the pledged Shares may, in the discretion of the Pledgee, be held by the Pledgee as collateral for, and/or then or at any time thereafter be applied in whole or in part by the Pledgee against all or any part of the amounts due under the Whitehouse Promissory Note. Any surplus of such cash or cash proceeds held by the Pledgee and remaining after payment in full of all the amounts due under the Whitehouse Promissory Note shall be paid over to the Pledgor entitled thereto or to whomsoever may be lawfully entitled to receive such surplus.

7. <u>Waiver of Rights</u>.

No delay or omission by the Pledgee in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Agreement. No waiver of any right shall be effective unless in writing and signed by the Pledgee, and no waiver on one occasion shall be construed as a waiver of any such right on any other occasion.

8. <u>Miscellaneous</u>.

This Agreement creates a continuing security interest in the pledged Shares and shall inure to the benefit of the Pledgee and its successors or assigns, and shall be binding upon the Pledgor and his heirs, assigns, executors and other personal representatives and shall be binding on the Company and its successors and assigns. This Agreement may not be amended except in writing signed by the party or parties against whom such amendment is sought to be enforced. This Agreement shall be interpreted under and governed by the laws of the State of New York

and shall terminate when all amounts due to Pledgee under the Whitehouse Promissory Note and the Redemption Agreement have been paid in full, or upon the death of Roberta L. Koeppel or forty-five years from the date of the issuance of the Whitehouse Promissory Note, at which time, if all amounts due to Pledgee prior to maturity have been paid, the Pledgee will return the Shares to the Pledgor within 30 days of the payment in full, or, provided notice of payment in full is given to the Pledgee at least 10 business days in advance, immediately upon payment in full with immediately available funds.

9. Notices.

All notices to be given pursuant to this Agreement shall be given in accordance with the notice provisions of the Redemption Agreement.

IN WITNESS WHEREOF, the parties hereto have deemed this Agreement to be duly executed all as of the day and year first above written.

WHITEHOUSE ESTATES INC.

By: ______________________
Roberta L. Koeppel, President

______________________
William W. Koeppel



RSP000220

State of New York )
) ss.:
County of New York )

On the ___ day of August in the year 2008 before me, the undersigned, personally appeared ROBERTA KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

[Seal]

Notary Public

State of New York )
) ss.:
County of New York )

On the ___ day of August in the year 2008 before me, the undersigned, personally appeared ALEXANDRA KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

[Seal]

Notary Public

State of New York )
) ss.:
County of New York )

On the ___ day of August in the year 2008 before me, the undersigned, personally appeared WILLIAM W. KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

[Seal]

Notary Public

## Rider to Stock Redemption Agreement

To facilitate the election of "S" corporation status for Whitehouse Estates, Inc. for the fiscal year beginning June 1, 2008, the undersigned, individually and in the representative capacities in which they have executed the Stock Redemption Agreement, dated August 11, 2008 (the "Stock Redemption Agreement") and the Settlement Agreement, dated as of June 1, 2008 (the "Settlement Agreement"), agree as follows:

1. Conflicts. To the extent of any conflicts between the Stock Redemption Agreement and/or the Settlement Agreement on the one hand, and this rider on the other hand, the provisions of this rider shall govern.

2. Terms. The capitalized terms used herein have the same meaning as in the Stock Redemption Agreement.

3. "S" Corporation Election by Unanimous Written Consent. Whitehouse Estates, Inc. shall elect "S" corporation status as of June 1, 2008 pursuant to the Unanimous Written Consent attached hereto as Exhibit 1 (including, without limitation, Exhibits A and B attached to the Unanimous Written Consent), and such election will be filed on or before August 14, 2008 by William Koeppel even if the Closing has not actually occurred by August 14, 2008.

4. Unanimous Written Consent to "Electing Small Business Trust". Whitehouse Estates, Inc. shall consent to and authorize the 1993 Ruth S. Koeppel Grantor Trust to make an Electing Small Business Trust ("ESBT") election as of June 1, 2008 pursuant to Unanimous Written Consent attached hereto as Exhibit 1 (including, without limitation, Exhibit C attached to the Unanimous Written Consent), and such election will be filed on behalf of the Trustee by William Koeppel on or before August 14, 2008, even if the Closing has not actually occurred by August 14, 2008.

5. Redemption of RSK's Stock. The redemption of the Whitehouse Estates, Inc. stock held in RSK's 93 Trust, pursuant to the Settlement Agreement, dated as of June 1, 2008 (the "Settlement Agreement"), is effective as of June 1, 2008, with the adjustments set forth in the Rider to Settlement Agreement with respect to the "S" corporation election and other issues which has been agreed to by all of the undersigned.

6. Redemption of RAK's Stock. The redemption of the Whitehouse Estates stock held by the Art 4th Trust will be effective as of the actual Closing Date, subject to the following adjustments:

(a) The cash and net proceeds from the sale of marketable securities held by Whitehouse Estates and to be used for the redemption of RSK's stock pursuant to the Settlement Agreement, will be determined as of May 31, 2008, in accordance with the Financial Statements for such fiscal year end, a copy of which is annexed as Exhibit 2.

(b) The earnings of Whitehouse Estates subsequent to May 31, 2008, and prior to the Closing, will be allocated and paid to the shareholders at Closing in accordance with the percentage interest each will hold after the

redemption of RSK's stock, that is, 59% to the Art 4th Trust and 41% to William. In the event that the "S" election for Whitehouse Estates as of June 1, 2008, is invalid or ineffective for any reason, the Art 4th Trust and William will each be responsible and indemnify Whitehouse Estates for any taxes payable by Whitehouse Estates based on the taxable earnings attributed and paid to such party.

7. Counterparts. This Rider may be executed in two or more counterparts, each of which shall be considered an original and all of which shall together constitute one and the same instrument. Facsimile signatures shall also be sufficient and fully binding.

Roberta L. Koeppel

William W. Koeppel

Alexandra Koeppel

Nancy S. Koeppel

Caroline Koeppel

State of New York )
) ss.:
County of New York )

On the [illegible] day of August in the year 2008 before me, the undersigned, personally appeared ROBERTA KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 2011

[Seal]

State of New York )
) ss.:
County of New York )

On the [illegible] day of August in the year 2008 before me, the undersigned, personally appeared ALEXANDRA KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 2011

[Seal]

State of New York )
) ss.:
County of New York )

On the 11th day of August in the year 2008 before me, the undersigned, personally appeared CAROLINE KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 2011 [Seal]

State of New York )
) ss.:
County of New York )

On the 11th day of August in the year 2008 before me, the undersigned, personally appeared WILLIAM W. KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 2011 [Seal]

State of New York )
) ss.:
County of New York )

On the 11th day of August in the year 2008 before me, the undersigned, personally appeared NANCY S. KOEPPEL, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

CRAIG AVEDISIAN
Notary Public, State of New York
No. 02AV6052999
Qualified in New York County
Commission Expires Jan. 2, 2011 [Seal]